## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| KARIMA ANDERSON, ANDREW BECKER, SHANNA BROWN, WAYNE NEWELL, REZA KUSANI, STUART REESE, ROBIN REESE, ZACK THOMPSON, and VICTOR KHOURY, | Civil Action No. |
| *Plaintiffs*, | _____ |
| v. | **Complaint – Class Action** |
| FLORIDA DEPARTMENT OF COMMERCE (FDOC) and J. ALEX KELLY, in his official capacity as Florida Secretary of Commerce, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiffs Karima Anderson, Andrew Becker, Shanna Brown, Wayne Newell, Reza Kusani, Stuart Reese, Robin Reese, Zack Thompson, and Victor Khoury bring this action for damages and declaratory and injunctive relief on behalf of themselves and a Class of others who were similarly discriminated against based on the color of their skin. Plaintiffs bring this case against the following Defendants, who are responsible for carrying out an unconstitutional, race-based social agenda: the Florida Department of Commerce and Alex Kelly, in his official capacity as Florida Secretary of Commerce (collectively "FDOC").

FDOC has developed, marketed, and administered its Florida Homeowner Assistance Fund program on the basis of race. FDOC's discrimination in the provision of COVID-19 relief funds violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to damages, a declaratory judgment, and injunctive relief.

## INTRODUCTION

1.    FDOC systematically discriminated against white homeowners when providing COVID-19 relief. As part of its Florida Homeowner Assistance Fund program, FDOC prioritized "socially disadvantaged individuals" in everything from

the development and marketing of its program to approving applications. FDOC impermissibly identified "socially disadvantaged individuals" based on their race.

2.    FDOC considers a homeowner to be a socially disadvantaged individual if the homeowner is a "an individual who (i) identifies as Black American, Hispanic American, Asian American or Native American (i.e., Alaska Native, Native Hawaiian, or an enrolled member of a Federally or State recognized Indian Tribe)." FDOC, Needs Assessment and Plan for the Homeowner Assistance Fund at 3, https://perma.cc/FN6N-AKQ6 ("Needs Assessment"). Homeowners of FDOC's preferred racial groups were automatically considered socially disadvantaged. White homeowners—which includes many different ethnicities and nationalities such as homeowners of Caucasian, Jewish, Middle Eastern and North African descent— were not.

3.    Homeowners designated as socially disadvantaged based on their race had clear advantages under the Florida Homeowner Assistance Fund program. FDOC prioritized consideration of applications based on a two-tier system. Tier 1 consisted of homeowners whose incomes were less than or equal to 100% Area Median Income ("AMI"). FDOC, Frequently Asked Questions at 4, https://perma.cc/HP6Z-GR5J ("Florida HAF FAQs"). Tier 2 consisted of homeowners whose incomes fell between 100% to 150% AMI. *Id.* FDOC first invited homeowners in Tier 1 to apply for assistance. *Id.* at 3. Only once FDOC had

assisted all Tier 1 homeowners did it indicate that it would invite homeowners in Tier 2 to apply for assistance. *Id.*

4.    Within each of those Tiers, FDOC prioritized applications from homeowners of its preferred racial groups. For instance, within Tier 1, FDOC prioritized applications submitted by "Socially Disadvantaged Individual[s]" with incomes less than or equal to 100% AMI and who lived in a "Qualified Census Tract" over applications from similarly situated non-socially disadvantaged individuals. *Id.* at 3-4. Also within Tier 1, FDOC prioritized applications from "Socially Disadvantaged Individual[s]" with incomes less than or equal to 100% AMI over applications from non-socially disadvantaged individuals with the same income levels. *Id.* Similarly, within Tier 2, FDOC prioritized applications from "Socially Disadvantaged Individual[s]" whose income was greater than 100% AMI, but less than or equal to 150% AMI, over applications from non-socially disadvantaged individuals whose income fell within that same range. *Id.*

5.    Under this race-based tiered scheme, FDOC would, for example, prioritize an application submitted by a black or Latino homeowner with a household size of 3 in Leon County, Florida and an income less than or equal to $90,000 (100% AMI) over an application submitted by a white homeowner in that county with the same household size and income unless that white homeowner could meet one of the other socially disadvantaged individual factors (like having limited English

proficiency or living in a persistent poverty county). HUD User, FY 2022 Homeowner Assistance Fund Income Limits Summary, https://perma.cc/M6AC-DNSN ("HUD FY 2022 Homeowner Assistance Fund Income Limits Summary"). In sum, FDOC provided assistance to black, Latino, Asian, or Native American applicants with incomes less than or equal to 100% AMI before providing assistance to similarly situated white applicants in that same income range who were not otherwise socially disadvantaged.

6.    This is just one of many ways in which FDOC's race-based program discriminated against white homeowners. FDOC also prioritized socially disadvantaged individuals in how it marketed its program—targeting its messaging about the program to its preferred racial groups.

7.    FDOC's use of a race-based definition of socially disadvantaged individuals is most dramatically reflected in the demographics of its application statistics. *Out of the approved applications, 72% of homeowners were black and 25% were white.* Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q2, 2024, https://perma.cc/54H4-MWV7. But those statistics do not reflect the population of Florida, where about 16.9% of citizens are black and 76.7% of citizens are white. U.S. Census Bureau, Quick Facts: Florida, https://perma.cc/3YGX-84GS.

This dramatic difference cannot be explained by income disparities or other race-independent reasons.

8.    As a result of FDOC's racial discrimination, white homeowners (including Plaintiffs) who struggled with the economic consequences of the COVID-19 pandemic lost out on financial assistance they needed to pay their mortgages. For example, Plaintiff Karima Anderson contracted COVID-19, which impacted her ability to work, caused a substantial loss in income, and led her to struggle to pay her mortgage. Plaintiff Andrew Becker's construction work suffered as a result of the pandemic, causing him to experience a significant loss of income and to fall behind on his mortgage and utility payments.  Plaintiff Wayne Newell missed two-and-half months of work due to the pandemic, causing him to struggle to pay his bills, including his mortgage for which he eventually entered into a period of forbearance. Plaintiff Reza Kusani's bee-keeping and farm-produce business suffered as a result of the pandemic, causing him to experience a significant loss of income and struggle to pay his mortgage. Plaintiffs Stuart and Robin Reese's bed-and-breakfast business saw a substantial decrease in reservations due to the pandemic, causing them to experience a significant loss of income and enter into mortgage forbearance. Plaintiff Zack Thompson's HVAC business slowed due to the pandemic, forcing him to search for another job and incur a substantial loss of income. But due to FDOC's discriminatory marketing and outreach about its Florida

Homeowner Assistance Fund program, Plaintiffs Anderson, Becker, Newell, Kusani, Stuart and Robin Reese, and Thompson never heard about the program.

9.    Plaintiff Shanna Brown worked as a home healthcare provider and for an interior design company but lost both jobs due to the pandemic. That financial hardship caused her to get behind on her mortgage, property taxes, and utilities. Likewise, Plaintiff Victor Khoury worked as an insurance inspector for restaurants, but he was unable to work when restaurants were closed due to the pandemic. That financial hardship caused him to have difficulty paying his bills, including his mortgage. But when Plaintiffs Brown and Khoury, who are Caucasian and Persian, applied for assistance through the Florida Homeowner Assistance Fund program, FDOC denied their applications despite their eligibility for assistance.

10.    Plaintiffs Anderson, Becker, Brown, Newell, Kusani, Stuart and Robin Reese, Thompson, Shanna Brown, and Victor Khouri—and many other Florida homeowners like them—needlessly suffered financial hardships because of FDOC's illegal race-based social agenda.

11.    There is no justification for FDOC's racial discrimination. FDOC could have administered its program in a race-neutral way. Instead, it discriminated against white homeowners in favor of homeowners from its preferred racial groups. But COVID-19 did not discriminate. Florida homeowners of all races needed assistance.

12.    FDOC's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

13.    Plaintiffs and the Class are entitled to damages and declaratory and injunctive relief under Title VI and the Equal Protection Clause.

## JURISDICTION & VENUE

14.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

15.    This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Florida.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant is a resident of this District and all Defendants are residents of Florida, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

17.    Plaintiff Karima Anderson is a resident of Florida.

18.    Plaintiff Andrew Becker is a resident of Florida.

19.    Plaintiff Shanna Brown is a resident of Florida.

20.    Plaintiff Wayne Newell is a resident of Florida.

21.    Plaintiff Reza Kusani is a resident of Florida.

22.    Plaintiff Stuart Reese is a resident of Florida.

23.    Plaintiff Robin Reese is a resident of Florida.

24.    Plaintiff Zack Thompson is a resident of Florida.

25.    Plaintiff Victor Khoury is a resident of Florida.

26.    Defendant Florida Department of Commerce ("FDOC") is the "state's chief agency for business recruitment and expansion and economic development," which "assist[s] the Governor in working with the Legislature, state agencies, business leaders, and economic development professionals to formulate and implement coherent and consistent policies and strategies designed to promote economic opportunities for all Floridians." Fl. Stat. § 20.60(4). (FDOC is the agency which superseded the Florida Department of Economic Opportunity—which originally developed and administered the Florida Homeowner Assistance Fund program—upon its creation in July 2024. *See id.*; *Walt Disney Parks & Resorts, Inc. v. DeSantis*, 716 F. Supp. 3d 1216, 1221 n.3 (N.D. Fla. 2024).) FDOC is responsible

for ensuring that the "state's goals and policies relating to economic development, workforce development, community planning and development, and affordable housing are fully integrated with appropriate implementation strategies." Fl. Stat. § 20.60(4)(d). FDOC's Division of Community Development is charged with administering "state and federal grant programs as provided by law." Fl. Stat. § 20.60(8)(b)(2); *see* Needs Assessment at 4 (indicating that the "Division of Community Development" is "overseeing the HAF"). FDOC, as the successor agency to the Florida Department of Economic Opportunity, developed, marketed, and administered the Florida Homeowner Assistance Fund program, and was awarded and oversaw the distribution of $676,102,379 in federal HAF funds from the United States Treasury. Dep't of Treasury, HAF Plans, https://perma.cc/XBL2-VBT5 ("U.S. Dep't of the Treasury HAF Plans"); Needs Assessment at 3; Florida HAF FAQs at 2.

27.    Defendant J. Alex Kelly is the Florida Secretary of Commerce. He has served in that office since 2023. As Secretary of Commerce, he serves as the "head of the department" and as "the Governor's chief negotiator for business recruitment and expansion and economic development." Fl. Stat. § 20.60(2). He is the successor to the Secretary of the Florida Department of Economic Opportunity, who oversaw the development and administration of the Florida Homeowner Assistance Fund program through the Florida Department of Economic Opportunity. *See Walt Disney*,

716 F. Supp. 3d at 1221 n.3; Florida Plan Submission at 3. Defendant Kelly is sued in his official capacity.

## LEGAL FRAMEWORK

28.    Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

29.    As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause [is] 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) ("*Fearless Fund Mgmt.*") (describing "race discrimination as 'subtle, pervasive, and essentially irremediable'" and noting that the burden of complying with Civil Rights statutes "pales in comparison to the interest in rooting out race discrimination in all its forms").

30.    Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

31.    Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

32.    Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

33.    Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason—"racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz*, 539 U.S. at 270). That is why, under strict scrutiny, "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest." *Holman v. Vilsack*, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)); *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 926 (11th Cir. 1997) ("The essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option."

(quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993))). Under strict scrutiny, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests" and, if so (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

34.     In sum, these constitutional and statutory standards require that all applicants for assistance in Florida—for school admission, government contracts, or, as relevant here, government assistance—receive "an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *5 (N.D. Tex. July 31, 2024) ("*Founders First Cmty.*") (quoting *SFFA*, 600 U.S. at 201-06).

## FACTUAL ALLEGATIONS

### I.    FDOC's Discriminatory Homeowner Assistance Fund Program

#### A. American Rescue Plan Act's Homeowner Assistance Fund

35.    In March 2021, during the COVID-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner Assistance Fund. *See* Pub. L. No. 117- 2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

36.    The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

37.    Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' requirements. *Id.* § 9058d(d)(2).

38.    The Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, but it largely leaves states to run their own specific programs based on their own implementation plans. The Treasury initially released 10% of each state's eligible funds for states to use in implementing pilot programs. To receive the rest of the funds, states were required to submit their proposed plans to implement and administer the full program. When

states submitted their plans, they requested a specific amount of funds. The Treasury reviewed the states' plans and provided feedback and recommendations before approving the plans and distributing the remaining funds. U.S. Dep't of the Treasury, HAF Plans.

### B. U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals

39.    The Act requires states to prioritize the distribution of funds to target specific populations of homeowners.

40.    First, the Act specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income for their household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." 15 U.S.C. § 9058d(c)(2).

41.    Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

42.    The Act does not define "socially disadvantaged individuals."

43.    In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of socially disadvantaged individual, explicitly defining that term based on race and including a presumption that individuals of particular races are socially disadvantaged:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2 (Apr. 14, 2021) (emphasis omitted), https://perma.cc/QYY4-6GBY.

44.    A few months later, in August 2021, the Treasury issued updated guidance redefining the term "socially disadvantaged individual." The new definition still provided that individuals who were "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" were socially disadvantaged. The full updated definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control. Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be

> a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

*The Homeowner Assistance Fund in the American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/EYQ8-LTLG (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

45.    The Treasury has used the same definition of socially disadvantaged individual in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2-3 (June 12, 2023), https://perma.cc/VM86-S2DM.

46.    The Treasury's guidance is not mandatory or binding on the States.

**C. Florida Homeowner Assistance Fund**

47.    FDOC submitted its initial proposal for implementing its HAF plan in December 2021, and after receiving and responding to feedback from the U.S. Treasury, FDOC's final proposal was approved in February 2022. FDOC was awarded $676,102,379 in HAF funds. Florida Plan Submission at 2, 19.

48.    Florida entitled its HAF program the "Florida Homeowner Assistance Fund."

49.    FDOC launched a pilot program of its Florida Homeowner Assistance Fund program in November 2021 and then launched the full program in February 2022.

50.    Under FDOC's Florida Homeowner Assistance Fund program, homeowners were eligible for up to $50,000 of relief. Florida HAF FAQs at 2. Eligible homeowners could obtain relief in the form of past-due mortgage payments, forward-looking mortgage payments, as well as assistance with property taxes, utility service payments, insurance, and HOA and condominium fees. *Id.* at 2-3, 6.

51.    FDOC's Florida Homeowner Assistance Fund program closed to new applications on August 26, 2022. FDOC, Florida Homeowner Assistance Fund, https://perma.cc/MR3Q-DXGN. However, FDOC is still administering the program, processing applications, and distributing the remaining federal funds.

### D. FDOC Considered Race When Developing, Marketing, and Administering its Florida Homeowner Assistance Fund Program.

52.    In developing its Florida Homeowner Assistance Fund program, FDOC chose to adopt a race-based definition of socially disadvantaged individuals in a manner not required by the Act.

53.    FDOC's race-based definition of socially disadvantaged individual was more narrow and racially specific than the definition suggested in non-binding Treasury guidance.

54.    FDOC defined "socially disadvantaged individual" based on explicit racial and ethnic groups. FDOC's plan submission stated that "[i]f the individual who is applying for the HAF Program attests [through self-certification] that he or she is a 'socially disadvantaged individual'" because the homeowner "identifies as

17

*Black American, Hispanic American, Asian American or Native American*," then the "the household [would] qualify for 'Socially Disadvantaged Individual' targeting." Florida Plan Submission at 11 (emphasis added); Needs Assessment at 3; Florida Term Sheet 1 at 2, https://perma.cc/ZC4S-X28M. Notably absent from this definition were white homeowners.

55.    FDOC's exclusion of white homeowners from its definition of socially disadvantaged individual resulted in discriminatory harm to a host of different ethnicities and nationalities. For example, "[t]he majority of U.S. Jews identify as White." Pew Research Center, Race, Ethnicity, Heritage and Immigration Among U.S. Jews (May 11, 2021), https://perma.cc/G4AP-JGUU. Moreover, the U.S. Census Bureau treats Persian and Iranian individuals as white. U.S. Census Bureau, 3.5 Million Reported Middle Eastern and North African Descent in 2020 (Sept. 21, 2023), https://perma.cc/K6V4-PP27. Indeed, Plaintiff Kusani is Persian and identifies as white. *See infra* ¶ 144.

56.    FDOC utilized its race-based definition of socially disadvantaged individuals in deciding how to develop its program, how and where to market and advertise its program, and how to prioritize granting applications and distributing program funds. In doing so, it prioritized homeowners from its preferred racial groups over white homeowners.

57.    In developing its plan, FDOC "obtained and reviewed quantitative data . . . regarding which demographic segments in its jurisdiction have historically experienced discrimination in the housing or housing finance market." Plan Submission at 3.

58.    FDOC also analyzed "demographic" factors of homeowners in the state and considered data regarding the impact of COVID-19 on homeowners with "socially disadvantaged backgrounds." Needs Assessment at 6, 11. Specifically, FDOC designed its plan to "target low-income homeowners and Socially Disadvantaged Individuals first." *Id.* at 17.

59.    To accomplish this, FDOC, "[e]arly in the plan development process," "held meetings with advocates and stakeholders from around the state, including community development corporations, homeless advocacy organizations, and mortgage lenders and servicers" in order to streamline its approach to reaching and providing aid to its "targeted" populations. *Id.* at 14. FDOC also used "data analytics" to identify 931,018 "Socially Disadvantaged Households" with incomes below 150% AMI as among their "target applicant populations." *Id.* at 17.

60.    In marketing and advertising its program to inform Florida citizens about the availability of funds and how to apply, FDOC targeted outreach to localities with concentrated populations of its favored racial groups—at the expense of white homeowners—based on its definition of socially disadvantaged individuals.

61.    FDOC's plan submission indicated that it would "include communications that primarily target[ed] . . . member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society[.]" Plan Submission at 12. The plan submission also stated that FDOC would "engage in outreach through partnerships with organizations that focus primarily in serving homeowners earning incomes below 100% of area median income or socially disadvantaged individuals and that have the capacity to engage targeted communities in a culturally and linguistically relevant manner to encourage the submission of applications for HAF resources from targeted populations." *Id.*

62.    Further, FDOC's Needs Assessment indicated that "[i]n order to be on the forefront of advocating for the equitable distribution of HAF funding, specifically reaching those socially underserved and disadvantaged communities, [FDOC] will utilize the data gathered to identify which communities of Homeowners are disproportionately impacted and target those populations with priority to drive participation and increase access to the program funding across applicable qualified expense categories." Needs Assessment at 24.

63.    FDOC employed among its marketing "strategies and tactics" the use of "alternate media, trade and non-profit organizations, niche publications, direct mail, and email marketing to reach . . . socially disadvantaged groups." *Id.* at 23. FDOC also "consulted with not-for-profit organizations" to "aid in the

communication and outreach efforts to low-income and socially disadvantaged communities." *Id.* at 5.

64. FDOC also used "both paid and Public Service Announcement placements on rural radio stations and in local publications to reach socially disadvantaged individuals who may be among those lacking internet access." *Id.* at 24. As part of this approach, FDOC "pa[id] particular attention to stations and publications that target specific racial and ethnic groups" and "identified media and marketing channels that had the highest pull-through rates, as well as information about which channels were most successful in reaching borrowers in Socially Disadvantaged communities." *Id.*

65. FDOC also utilized mortgage servicers, utility providers, and homeowner and flood insurance providers to direct outreach about the Florida Homeowner Assistance Fund to individuals based on race. Plan Submission at 3-4.

66. These targeted marketing efforts benefitted homeowners who were automatically considered socially disadvantaged individuals based on their race at the expense of white homeowners. FDOC specifically informed homeowners in its preferred racial groups about the program but did not do the same for white homeowners. This made it more likely that individuals deemed socially disadvantaged based on race would receive funding at the expense of white

homeowners who were eligible to receive funding but to whom FDOC did not provide the same information.

67.    In reviewing and granting applications, FDOC prioritized applications based on race, prioritizing applications submitted by homeowners in FDOC's preferred racial groups over those submitted by white homeowners.

68.    As part of the application process, FDOC determined whether homeowner applicants were socially disadvantaged. FDOC automatically considered homeowner applicants to be socially disadvantaged "because of the applicant's race" if the homeowner submitted a "written attestation" that they were a "Black American, Hispanic American, Asian American or Native American." *Id.* at 11.

69.    FDOC prioritized consideration of applications based on a two-tier system. Tier 1 consisted of homeowners whose incomes were less than or equal to 100% AMI. Florida HAF FAQs at 4. Tier 2 consisted of homeowners whose incomes fell between 100% to 150% AMI. *Id.* FDOC first invited homeowners in Tier 1 to apply for assistance. *Id.* at 3. Only once FDOC had assisted all Tier 1 homeowners did it indicate that it would invite homeowners in Tier 2 to apply for assistance. *Id.* at 3-4.

70.    Within each of those Tiers, FDOC prioritized consideration of applications from homeowners within its preferred racial groups. For instance,

within Tier 1, FDOC prioritized applications submitted by "Socially Disadvantaged Individual[s]" with incomes less than or equal to 100% AMI and who lived in a "Qualified Census Tract" over applications from non-socially disadvantaged individuals with the same income levels and who were also living in Qualified Census Tracts. *Id.* at 4. Similarly within Tier 1, FDOC prioritized applications from "Socially Disadvantaged Individual[s]" with incomes less than or equal to 100% AMI over applications from non-socially disadvantaged individuals with the same income levels. *Id.*

71.    Within Tier 2, FDOC prioritized applications from "Socially Disadvantaged Individual[s]" whose income was greater than 100% AMI but less than or equal to 150% AMI over applications from non-socially disadvantaged individuals whose income fell within that same range. *Id.*

72.    Under this race-based tiered scheme, FDOC would, for example, prioritize an application submitted by a black or Latino homeowner with a household size of 3 in Leon County, Florida and an income less than or equal to $90,000 (100% AMI) over an application submitted by a white homeowner in that county with the same household size and income unless those white homeowners could meet one of the other socially disadvantaged individual factors (like having limited English proficiency or living in a persistent poverty county). HUD FY 2022 Homeowner Assistance Fund Income Limits Summary. In sum, FDOC provided assistance to

black, Latino, Asian, or Native American applicants with incomes less than or equal to 100% AMI before providing assistance to similarly situated white applicants in that same income range who were not otherwise socially disadvantaged.

73.    FDOC's prioritization included preference in granting and denying applications and distribution of funds—*i.e.*, applications submitted by minority homeowners were given priority over applications submitted by white homeowners. Florida HAF FAQs at 3-4.

74.    Upon information and belief, FDOC's prioritization also included preference in assisting applicants with the applications process, prioritizing application assistance to applicants of FDOC's preferred minority racial and ethnic groups over white applicants.

75.    FDOC required all applicants to select their race in completing and submitting an application. FDOC, Florida Homeowner Assistance Fund: Registration and Application Guide at 18 (May 6, 2022), https://perma.cc/4USZ-ZLRS. It then used applicants' race to determine whether they should be prioritized for assistance as socially disadvantaged individuals. *See* Needs Assessment at 34.

76.    FDOC's targeting scheme and prioritization of applications based on race meant that FDOC distributed funds first to applicants of its preferred minority racial and ethnic groups, which resulted in many white applicants being denied for lack of sufficient funds.

77.    FDOC also tracked the progress of its program by "disaggregate[ing] [metrics] by race, age, ethnicity, and geographic location." *Id.*; *see id.* at 35 ("To determine the effectiveness of our targeting strategy, we will disaggregate application data by multiple factors, including race, ethnicity, and geography.").

78.    FDOC's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. *Out of the approved applications, 72% of homeowners were black and 25% were white.* Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q2, 2024, https://perma.cc/54H4-MWV7. But those statistics do not reflect the population of Florida, where about 16.9% of citizens are black and 76.7% of citizens are white. U.S. Census Bureau, Quick Facts: Florida, https://perma.cc/3YGX-84GS. This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about 29.9% of Florida citizens below the poverty line are black while about 67.4% are white. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/3PTH-63GC.

## II.    Effect of FDOC's Racial Discrimination on Plaintiffs

79.    Because of FDOC's race-based implementation of its Florida Homeowner Assistance Fund program, Plaintiffs were deprived of the opportunity

to learn about the program and apply for assistance, were deterred from applying for assistance, or were denied assistance after applying because of their race.

**A. Plaintiff Karima Anderson**

80.    Plaintiff Karima Anderson is a resident of Florida.

81.    Plaintiff Anderson is white.

82.    Plaintiff Anderson owns a home in Leon County, Florida, and has a mortgage on the home.

83.    Plaintiff Anderson is a licensed therapist and social worker.

84.    During the COVID-19 pandemic, Plaintiff Anderson contracted COVID-19 and was ultimately diagnosed with long-COVID.

85.    Plaintiff Anderson's illness impacted her ability to work, leading to a significant loss in income.

86.    Plaintiff Anderson also incurred substantial medical expenses related to her COVID-19 diagnosis, including costs related to the numerous medications she must take to relieve her long-COVID symptoms.

87.    Ultimately, Plaintiff Anderson's loss in income and increased medical expenses caused her to incur thousands of dollars in credit-card debt.

88.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Anderson struggled to pay her bills, including her mortgage.

89.    Plaintiff Anderson was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because she met its income limits and other requirements.

90.    Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiff Anderson never heard about the program.

91.    Because Plaintiff Anderson never heard about the program as a result of FDOC's discriminatory targeting, marketing, and outreach, she was unable to apply for and obtain financial assistance for which she plainly qualified—including assistance related to her mortgage payments—before the program closed to new applications in August 2022.

92.    Therefore, Plaintiff Anderson was harmed by FDOC's racially discriminatory marketing practices.

93.    Plaintiff Anderson was ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

94.    Had Plaintiff Anderson been informed about the program by FDOC, she would have applied for and been eligible for assistance. If FDOC had not discriminated on the basis of race in administering the program, Plaintiff Anderson would have received much-needed COVID-19 relief.

**B. Plaintiff Andrew Becker**

95.    Plaintiff Andrew Becker is a resident of Florida.

96.    Plaintiff Becker is white.

97.    Plaintiff Becker owns a home in Leon County, Florida, and has a mortgage on the home.

98.    Plaintiff Becker is a contractor who works in the construction industry.

99.    During the COVID-19 pandemic, Plaintiff Becker contracted COVID-19, which caused him to miss work.

100.    The COVID-19 pandemic also forced Plaintiff Becker, who is a widower, to stay at home with his school-aged daughter because the public schools were closed to in-person classes. This caused Plaintiff Becker to lose out on job opportunities and resulted in decreased income.

101.    Additionally, the COVID-19 pandemic caused Plaintiff Becker to lose construction jobs due to government lockdowns and fewer customers hiring him for projects due to fear of the pandemic.

102.    Plaintiff Becker therefore lost significant income due to the COVID-19 pandemic.

103.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Becker struggled to pay his bills, including his mortgage.

104.   For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Becker fell behind, and remains behind, on his mortgage payments.

105.   Plaintiff Becker also fell behind on his utility payments due to the financial hardships he experienced because of the COVID-19 pandemic.

106.   Plaintiff Becker was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because he met its income limits and other requirements.

107.   Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiff Becker never heard about the program.

108.   Because Plaintiff Becker never heard about the program as a result of FDOC's discriminatory targeting, marketing, and outreach, he was unable to apply for and obtain financial assistance for which he plainly qualified—including assistance related to his mortgage and utility payments—before the program closed to new applications in August 2022.

109.   Therefore, Plaintiff Becker was harmed by FDOC's racially discriminatory marketing practices.

110.   Plaintiff Becker was ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

111.   Had Plaintiff Becker been informed about the program by FDOC, he would have applied for and been eligible for assistance. If FDOC had not discriminated on the basis of race in administering the program, Plaintiff Becker would have received much-needed COVID-19 relief.

### C. Plaintiff Shanna Brown

112.   Plaintiff Shanna Brown is a resident of Florida.

113.   Plaintiff Brown is white.

114.   Plaintiff Brown owns a home in Leon County, Florida, and has a mortgage on the home.

115.   Plaintiff Brown worked as a home healthcare provider and for an interior design company.

116.   During the COVID-19 pandemic, Plaintiff Brown lost both her homecare and interior design jobs. In both instances, she lost her job because clients no longer felt comfortable having people in their homes due to fear of infection from the pandemic.

117.   Because of the pandemic, Plaintiff Brown experienced a significant loss in income.

118.   Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Brown struggled to pay her bills, including her mortgage.

119. For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Brown fell behind on her mortgage payments.

120. Plaintiff Brown also struggled to make her property tax and utility payments due to the financial hardships she experienced because of the COVID-19 pandemic.

121. Plaintiff Brown applied for financial assistance through FDOC's Florida Homeowner Assistance Fund program while the program was still accepting applications.

122. Plaintiff Brown was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because she met its income limits and other requirements.

123. Plaintiff Brown applied for relief under the program, but FDOC denied her application.

124. Upon information and belief, FDOC's denial of Plaintiff Brown's application was due to FDOC's race-based criteria, including its prioritization of applications and distribution of funds.

125. Upon information and belief, Plaintiff Brown would have received financial assistance had FDOC not discriminated based on race.

126. Because Plaintiff Brown's application was denied, she was unable to obtain financial assistance for her mortgage.

127. Therefore, Plaintiff Brown was harmed by FDOC's racial discrimination.

**D. Plaintiff Wayne Newell**

128. Plaintiff Wayne Newell is a resident of Florida.

129. Plaintiff Newell is white.

130. Plaintiff Newell owns a home in Leon County, Florida, and has a mortgage on the home.

131. Plaintiff Newell worked for Enterprise Rent-A-Car, remarketing and selling cars.

132. During the COVID-19 pandemic, Plaintiff Newell was out of work for two months because Enterprise shut down its remarketing operations due to the pandemic.

133. Once Plaintiff Newell went back to work at Enterprise, he contracted COVID-19 and missed an additional two weeks of work.

134. The COVID-19 pandemic therefore caused Plaintiff Newell to incur a significant loss in income.

135. Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Newell struggled to pay his bills, including his mortgage.

136.   For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Newell fell behind on his mortgage payments and was forced to enter a period of mortgage forbearance.

137.   Plaintiff Newell was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because he met its income limits and other requirements.

138.   Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiff Newell never heard about the program.

139.   Because Plaintiff Newell never heard about the program as a result of FDOC's discriminatory targeting, marketing, and outreach, he was unable to apply for and obtain financial assistance for which he plainly qualified—including assistance related to his home loan payments—before the program closed to new applications in August 2022.

140.   Therefore, Plaintiff Newell was harmed by FDOC's racially discriminatory marketing practices.

141.   Plaintiff Newell was ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

142.   Had Plaintiff Newell been informed about the program by FDOC, he would have applied for and been eligible for assistance. If FDOC had not

discriminated on the basis of race in administering the program, Plaintiff Newell would have received much-needed COVID-19 relief.

### E. Plaintiff Reza Kusani

143. Plaintiff Reza Kusani is a resident of Florida.

144. Plaintiff Kusani is white.

145. Plaintiff Kusani owns a home in Sumter County, Florida, and has a mortgage on the home.

146. Plaintiff Kusani is a beekeeper and farmer. He sells goods and produce from his beekeeping and farming business.

147. During the COVID-19 pandemic, Plaintiff Kusani's business suffered as customers were in lockdown, otherwise staying at home, and not purchasing the same quantity of goods that they were purchasing before the pandemic.

148. The COVID-19 pandemic therefore caused Plaintiff Kusani to incur a significant loss in income.

149. Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Kusani struggled to pay his bills, including his mortgage.

150. Plaintiff Kusani was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because he met its income limits and other requirements.

151.   Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiff Kusani never heard about the program.

152.   Because Plaintiff Kusani never heard about the program as a result of FDOC's discriminatory targeting, marketing, and outreach, he was unable to apply for and obtain financial assistance for which he plainly qualified—including assistance related to his mortgage payments—before the program closed to new applications in August 2022.

153.   Therefore, Plaintiff Kusani was harmed by FDOC's racially discriminatory marketing practices.

154.   Plaintiff Kusani was ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

155.   Had Plaintiff Kusani been informed about the program by FDOC, he would have applied for and been eligible for assistance. If FDOC had not discriminated on the basis of race in administering the program, Plaintiff Kusani would have received much-needed COVID-19 relief.

**F. Plaintiffs Stuart and Robin Reese**

156.   Plaintiffs Stuart and Robin Reese are residents of Florida.

157.   Plaintiffs Stuart and Robin Reese are white.

158.    Plaintiffs Stuart and Robin Reese own a home in Leon County, Florida, and have a mortgage on the home.

159.    Plaintiffs Stuart and Robin Reese own and run a bed-and-breakfast business.

160.    During the COVID-19 pandemic, their bed and breakfast was closed for almost a year due to restrictions and risks from the pandemic.

161.    Even after the business was able to reopen, they had fewer customers than before the pandemic.

162.    The COVID-19 pandemic therefore caused Plaintiffs Stuart and Robin Reese to incur a significant loss in income.

163.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiffs Stuart and Robin Reese struggled to pay their bills, including their mortgage.

164.    For example, as a result of their financial hardships related to the COVID-19 pandemic, Plaintiffs Stuart and Robin Reese were forced to enter mortgage forbearance, which lasted for years.

165.    Plaintiffs Stuart and Robin Reese were eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because they met its income limits and other requirements.

166.   Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiffs Stuart and Robin Reese did not hear about the program until long after it had closed to new applications.

167.   Because Plaintiffs Stuart and Robin Reese never heard about the program while it was accepting applications due to FDOC's discriminatory targeting, marketing, and outreach, they were unable to apply for and obtain financial assistance for which they plainly qualified—including assistance related to their mortgage payments—before the program closed to new applications in August 2022.

168.   Therefore, Plaintiffs Stuart and Robin Reese were harmed by FDOC's racially discriminatory marketing practices.

169.   Plaintiffs Stuart and Robin Reese were ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

170.   Had Plaintiffs Stuart and Robin Reese been informed about the program by FDOC, they would have applied for and been eligible for assistance. If FDOC had not discriminated on the basis of race in administering the program, Plaintiffs Stuart and Robin Reese would have received much-needed COVID-19 relief.

**G. Plaintiff Zack Thompson**

171.   Plaintiff Zack Thompson is a resident of Florida.

172.   Plaintiff Thompson is white.

37

173. Plaintiff Thompson owns a home in Nassau County, Florida, and has a mortgage on the home.

174. Plaintiff Thompson worked for an HVAC company before the COVID-19 pandemic.

175. During the COVID-19 pandemic, Plaintiff Thompson's HVAC job suffered as he had less customers and had problems obtaining necessary supplies due to supply-chain issues caused by the pandemic. Because of these challenges, Plaintiff Thompson was forced to find a new job. Plaintiff Thompson was without pay for weeks between jobs, causing him a significant financial hardship.

176. Around this same time, Plaintiff Thompson's fiancée's grandmother passed away due to complications from COVID-19, and Plaintiff Thompson was forced to pay for the substantial funeral costs, causing additional financial hardship.

177. The COVID-19 pandemic therefore caused Plaintiff Thompson to incur a significant loss in income and other financial difficulties.

178. Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Thompson struggled to pay his bills, including his mortgage.

179. Plaintiff Thompson was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because he met its income limits and other requirements.

180.   Due to FDOC's discriminatory targeting, marketing, and outreach regarding its Florida Homeowner Assistance Fund program, Plaintiff Thompson never heard about the program.

181.   Because Plaintiff Thompson never heard about the program as a result of FDOC's discriminatory targeting, marketing, and outreach, he was unable to apply for and obtain financial assistance for which he plainly qualified—including assistance related to his mortgage payments—before the program closed to new applications in August 2022.

182.   Therefore, Plaintiff Thompson was harmed by FDOC's racially discriminatory marketing practices.

183.   Plaintiff Thompson was ready and able to apply for relief through FDOC's Florida Homeowner Assistance Fund program.

184.   Had Plaintiff Thompson been informed about the program by FDOC, he would have applied for and been eligible for assistance. If FDOC had not discriminated on the basis of race in administering the program, Plaintiff Thompson would have received much-needed COVID-19 relief.

**H. Plaintiff Victor Khoury**

185.   Plaintiff Victor Khoury is a resident of Florida.

186.   Plaintiff Khoury is white.

187.   Plaintiff Khoury owns a home in Palm Beach County, Florida, and has a mortgage on the home.

188.   Plaintiff Khoury worked as a restaurant insurance inspector.

189.   During the COVID-19 pandemic, Plaintiff Khoury was unable to work because the restaurants he inspected were closed due to the pandemic.

190.   Because of the pandemic, Plaintiff Khoury experienced a significant loss in income.

191.   Plaintiff Khoury also experienced a significant increase in household and housing-related expenses due to the COVID-19 pandemic.

192.   Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Khoury struggled to pay his bills, including his mortgage.

193.   Plaintiff Khoury applied for financial assistance through FDOC's Florida Homeowner Assistance Fund program while the program was still accepting applications.

194.   Plaintiff Khoury was eligible for financial assistance through FDOC's Florida Homeowner Assistance Fund program because he met its income limits and other requirements.

195.   Plaintiff Khoury applied for relief under the program, but FDOC denied his application.

196.  Upon information and belief, FDOC's denial of Plaintiff Khoury's application was due to FDOC's race-based criteria, including its prioritization of applications and distribution of funds.

197.  Upon information and belief, Plaintiff Khoury would have received financial assistance had FDOC not discriminated based on race.

198.  Because Plaintiff Khoury's application was denied, he was unable to obtain financial assistance for his mortgage.

199.  Therefore, Plaintiff Khoury was harmed by FDOC's racial discrimination.

## CLASS ALLEGATIONS

200.  Plaintiffs bring this action on behalf of themselves and other Florida homeowners similarly entitled to relief.

201.  The Class here consists of:

a.  All Florida homeowners who applied for assistance under FDOC's Florida Homeowner Assistance Fund program, who are white, who were otherwise eligible for funds under the program but did not meet FDOC's definition of socially disadvantaged individual, and who had their applications denied or delayed in processing by FDOC because of FDOC's race-based prioritizing of applications.

b.   All Florida homeowners who are white, who were otherwise eligible for funds under FDOC's Florida Homeowner Assistance Fund program but did not meet FDOC's definition of socially disadvantaged individual, and who never learned about the program because of FDOC's race-based marketing and outreach.

202.   Class members are seeking damages from FDOC under Title VI for unlawful discrimination in the development, marketing, and administration of the Florida Homeowner Assistance Fund program.

203.   Class members are also seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Florida Homeowner Assistance Fund program unlawful and requiring FDOC to stop administering the program in a racially discriminatory manner.

204.   In the alternative, Class members are seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Florida Homeowner Assistance Fund program unlawful, requiring FDOC to stop administering the program in a racially discriminatory manner, and requiring FDOC to reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

205.   The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

206.   The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Florida and the thousands of homeowners who applied for the Florida Homeowner Assistance Fund program, there are at least thousands of members of the proposed Class.

207.   Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

a.     Whether FDOC defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

b.     Whether FDOC intentionally targeted non-white homeowners in its Florida Homeowner Assistance Fund marketing;

c.     Whether FDOC intentionally prioritized non-white homeowners in its review of Homeowner Assistance Fund applications;

d.     Whether FDOC discriminated against Class members on the basis of their race;

e.    Whether FDOC's challenged conduct violates Title VI; and

f.    Whether FDOC's challenged conduct violates the Equal Protection Clause.

208.    Plaintiffs' claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Florida homeowners, who were eligible for funds under the Florida Homeowner Assistance Fund program, are white and otherwise did not meet FDOC's definition of socially disadvantaged individuals, and who either (i) applied for the program and were denied funds or had the processing of their application delayed or (ii) never learned of the program in the first place because of their race. They were therefore similarly affected by FDOC's wrongful conduct complained of herein.

209.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiffs have no interests adverse or antagonistic to the Class.

210.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing

assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage servicer information, and publicly available data. Class-wide damages also can be readily calculated based on the information available in FDOC's Florida Homeowner Assistance Fund program. Prosecution as a class action will eliminate the possibility of unnecessary, repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the COVID-19 pandemic.

211.   The Class is also certifiable under Federal Rule of Civil Procedure 23(b)(2). *See Miller v. Vilsack*, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (certifying 23(b)(2) class in challenge to USDA's distribution of loan forgiveness to "socially disadvantaged" applicants). FDOC has discriminated and continues to discriminate on grounds that apply generally to the Class—namely, prioritizing

applications and marketing the Florida Homeowner Assistance Fund program based on race. Therefore, declaratory and injunctive relief declaring that FDOC's development, marketing, and implementation of its Florida Homeowner Assistance Fund program is unlawful and requiring FDOC to stop administering the program in a racially discriminatory manner in the distribution of any remaining funds, or, in the alternative, to reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN PRIORITIZATION OF APPLICATIONS

212.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

213.    **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

214.    This provision of Title VI may be enforced through suits by private individuals for damages and injunctive relief. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

215.    To establish a cause of action pursuant to Title VI, a plaintiff must prove (1) that there is discrimination "on the ground of race, color, or national origin" and (2) that the entity engaging in discrimination receives "Federal financial assistance." *Ware v. N. Fla. Reg'l Med. Ctr. Inc.*, 2023 WL 3466652, at *3 (N.D. Fla. Feb. 28, 2023); *Alexander*, 532 U.S. at 280.

216.    Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

217.    "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring); *see Founders First Cmty.*, 2024 WL 3625684 at *3-4 (holding that plaintiff's discrimination claim pursuant to 42 U.S.C. § 1981 likely to succeed on the merits because program "discriminates against applicants . . . based on race").

218.   But, at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

219.   **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

220.   Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is never a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted).

Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past discrimination" is not a compelling interest because it "provides no guidance for [the government] to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

221.   Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

222.   If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207. To be narrowly tailored, a racial classification must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *Id.* at 230. This means that it must be targeted—*i.e.*, it cannot be over- or under-inclusive. *See id.* at 216;

*see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *SFFA*, 600 U.S. at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

223. **FDOC's Use of Race in Prioritizing Applications Fails Strict Scrutiny.** FDOC received federal financial assistance from the HAF program and intentionally used those federal funds to prioritize granting applications and distributing funds to homeowners in preferred racial and ethnic groups over white homeowners through its Florida Homeowner Assistance Fund program.

224. FDOC used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and prioritized applications submitted by those "socially disadvantaged individuals" over white homeowners.

225. Many eligible white homeowners—like Plaintiffs Brown and Koury—were eligible for assistance and applied for FDOC's Florida Homeowner Assistance program but were denied due to Florida's use of race in prioritizing applications under its program.

226. Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d

at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of "socially disadvantaged" applicants based on race failed strict scrutiny); *Strickland v. U.S. Dep't of Agric.*, 2024 WL 2886574, at *9 (N.D. Tex. June 7, 2024) (holding that USDA's Emergency Relief Program's distribution of more relief funds to "socially disadvantaged farmers" than white farmers failed strict scrutiny); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 509 (N.D. Tex. 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1294 (M.D. Fla. 2021) (holding that USDA's distribution of loan forgiveness to "socially disadvantaged" applicants based on race failed strict scrutiny); *Holman*, 2021 WL 2877915, at *6 (same); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (same).

227.    And courts have recently held other race-based application programs to be unlawful under similar civil rights statutes. *See Fearless Fund Mgmt.*, 103 F.4th at 769, 777 (holding that private grant contest "open only to businesses owned by black women" unlawfully discriminated on the basis of race in violation of 42 U.S.C.

§ 1981); *Founders First Cmty.*, 2024 WL 3625684, at *3-4 (holding that private small business grant program that required "applicants [to] identify as . . . Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a low to moderate income area" unlawfully discriminated "based on race" in violation of 42 U.S.C. § 1981).

228.   Because FDOC's Florida Homeowner Assistance Fund program prioritized applications based on race, strict scrutiny applies.

229.   FDOC's race-based prioritization scheme for reviewing and granting applications through its Florida Homeowner Assistance Fund program fails to satisfy strict scrutiny.

230.   FDOC's use of race in prioritizing applications to socially disadvantaged individuals does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination against a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

231.   Moreover, FDOC's use of race to prioritize socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination. Rather, the Florida Homeowner Assistance Fund program is based on a generalized notion of remedying past societal discrimination

for homeowners of its preferred racial and ethnic groups, declaring homeowners to be socially disadvantaged individuals if they identify "as Black American, Hispanic American, Asian American or Native American." Plan Submission at 11. In other words, the program was not targeted toward some specific episode of past, intentional discrimination in which FDOC had participated.

232. Even if FDOC could show a compelling interest in its race-based Florida Homeowner Assistance Fund program, the program is not narrowly tailored.

233. *First*, FDOC failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing applications according to a race-based definition of socially disadvantaged individuals.

234. For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK ("Texas HAF Plan").

235. California, too, used race-neutral criteria to prioritize aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for

Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 10-11 (Dec. 9, 2021), https://perma.cc/6LBT-A9P9 ("California HAF Plan"). As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/MEC2-44E8 ("HUD, Qualified Census Tracts and Difficult Development Areas"). As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/7M6T-T4GM ("UCLA, California COVID-19 Owner Vulnerability").

236.   FDOC could have also defined socially disadvantaged individual status based on race-neutral factors such as geographic location, family size, risk of eviction, mortgage debt, or countless others and used those factors to prioritize applications. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

237.   *Second*, FDOC's prioritizing applications for socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that homeowners in FDOC's preferred racial groups are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. And in the context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. FDOC's program has "finite resources," which means that any prioritization makes a big difference—applicants who qualify as socially disadvantaged individuals based on their race have earlier and easier access to funds than applicants who do not meet the racial criteria, and applicants at the back of the line risk having crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 721 F. Supp. 3d at *493 ("[T]he fact that the latter applicants have a backdoor to benefits doesn't change the initial disadvantage conferred by the stereotype."); *see SFFA*, 600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence,

members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

238. *Third*, FDOC's Florida Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing homeowners' applications based on race—for example, prioritizing a minority applicant who lost his job due to supply-chain issues caused by the COVID-19 pandemic and has trouble making mortgage payments due to the loss of income has nothing to do with remediating past discrimination. In any event, the program is underinclusive—the program excludes both minority homeowners who do not fall within its income limits and those white homeowners who have experienced discrimination. The program is also underinclusive in that it prioritizes assistance to certain preferred minority racial and ethnic groups, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. FDOC's program is also overinclusive—it prioritizes applications submitted by non-white homeowners regardless of whether those homeowners or their specific racial groups have experienced housing discrimination.

239.   Because FDOC's intentional use of race in prioritizing applications as a part of its Florida Homeowner Assistance Fund program fails strict scrutiny, FDOC's actions violate the Equal Protection Clause and Title VI.

240.   Plaintiffs and other Class members have suffered damages as a direct and proximate result of FDOC's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all FDOC funds that they have been wrongfully deprived of because of their race.

241.   Plaintiffs and other Class members are also entitled to nominal damages for FDOC's completed violation of their legal rights under the Equal Protection Clause and Title VI.

242.   Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that FDOC's Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring FDOC to stop administering the program in a racially discriminatory manner.

243.   In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that FDOC's Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring FDOC to reopen the program and reconsider denied applications on a race-neutral basis.

244.   Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## COUNT II
## 42 U.S.C. § 2000d & 42 U.S.C. § 1983
## RACIAL DISCRIMINATION IN MARKETING AND OUTREACH

245.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

246.   FDOC received federal financial assistance from the federal HAF program and intentionally used those federal funds to market its Florida Homeowner Assistance Fund program to state-preferred minority homeowners at the expense of white homeowners.

247.   FDOC used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and it developed and implemented an outreach and marketing program to advertise its Florida Homeowner Assistance Fund program to FDOC's preferred racial and ethnic groups. White homeowners were not targeted for outreach or marketing as part of FDOC's marketing plan.

248.   Many eligible white homeowners—like Plaintiffs Anderson, Becker, Newell, Kusani, Stuart and Robin Reese, and Thompson—thus had no idea that they could obtain the significant financial assistance the Florida Homeowner Assistance Fund program offered. Had eligible white homeowners like Plaintiffs Anderson,

Becker, Newell, Kusani, Stuart and Robin Reese, and Thompson known about the program, they would have applied and obtained substantial financial assistance.

249.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364; *Nuziard*, 721 F. Supp. 3d at 509; *Wynn*, 545 F. Supp. 3d at 1294; *Holman*, 2021 WL 2877915, at *13; *Faust*, 519 F. Supp. 3d at 478; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774; *Strickland*, 2024 WL 2886574, at *9; *cf. Fearless Fund Mgmt.*, 103 F.4th at 769, 777; *Founders First Cmty.*, 2024 WL 3625684, at *3-4.

250.    Because FDOC's Florida Homeowner Assistance Fund program chose to market and conduct other outreach efforts to homeowners based on race, strict scrutiny applies.

251.    FDOC's race-based marketing plan for advertising and informing homeowners about its Florida Homeowner Assistance Fund program fails to satisfy strict scrutiny.

252.    FDOC's use of race in deciding how and to whom to market its program does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination

to a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

253.   Moreover, FDOC's use of race to market its program to homeowners in its preferred racial and ethnic groups over white homeowners does not remediate any specific, identified instances of past discrimination.

254.   Even if FDOC could show a compelling interest in its race-based Florida Homeowner Assistance Fund program, the program is not narrowly tailored.

255.   *First*, FDOC failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without marketing their programs to preferred racial minority groups rather than all eligible homeowners.

256.   For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and targeted marketing and outreach to those homeowners. Texas HAF Plan at 11.

257.   California, too, used race-neutral criteria to target outreach about aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and targeted marketing and outreach to those homeowners. California HAF Plan at 11. As defined by the U.S. Department of

Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." HUD, Qualified Census Tracts and Difficult Development Areas. As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA, California COVID-19 Owner Vulnerability.

258. FDOC could have marketed its program equally across the state, ensuring that all eligible homeowners had equal opportunity to learn about the available financial assistance. FDOC also could have targeted its marketing to specific areas or specific homeowners based on race-neutral factors like income, poverty level, family size, eviction rates, mortgage delinquencies, etc. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

259.    *Second*, FDOC's marketing to socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. In other words, FDOC decided it was more important that homeowners of certain racial groups hear about the program rather than homeowners who are members of disfavored races. And in the context of marketing a program that distributes federal benefits, marketing to some homeowners but not others "necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. FDOC's program had "finite resources," which means that marketing makes a big difference—homeowners deemed socially disadvantaged individuals based on their race have earlier and easier opportunity to learn about the program (and apply for funds) than homeowners who do not meet the racial criteria, and applicants who do not hear about the program (or hear about it too late) risk having these crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 721 F. Supp. 3d at 493; *see SFFA*, 600 U.S. at 219.

260.    *Third*, FDOC's Florida Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by marketing the program to certain homeowners but not others based on race. For one, it is underinclusive—the program excludes

minority homeowners who do not fall within its income limits and white homeowners who do fall within its income limits even if those white homeowners experienced discrimination. And to the extent FDOC marketed to certain geographic areas but not others based on race, that too is underinclusive because it ignores minority homeowners in other non-targeted geographic areas. The program is also underinclusive in that it prioritized marketing to certain preferred minority racial and ethnic groups, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. It is also overinclusive—it marketed the program to homeowners based on race, regardless of whether those homeowners or their specific racial group experienced housing discrimination and regardless of whether the homeowners are eligible for benefits under the program.

261.   Because FDOC's intentional use of race in marketing its Florida Homeowner Assistance Fund program fails strict scrutiny, FDOC's actions violate the Equal Protection Clause and Title VI.

262.   Plaintiffs and other Class members have suffered damages as a direct and proximate result of FDOC's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all Florida Homeowner Assistance Fund funds that they have been wrongfully deprived of because of their race.

263.   Plaintiffs and other Class members are also entitled to nominal damages for FDOC's completed violation of their legal rights under the Equal Protection Clause and Title VI.

264.   Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that FDOC's Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring FDOC to stop administering the program in a racially discriminatory manner.

265.   In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that FDOC's Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring FDOC reopen the program, market the program on a race-neutral basis, and consider new applications on a race-neutral basis.

266.   Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

a.  Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b.  Award Plaintiffs and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c.  Award Plaintiffs and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d. Declare that Defendants' racially discriminatory development, marketing, and administration of the Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner.

e. Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of the Florida Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner, reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

f. Enter judgment in favor of Plaintiffs and the Class members;

g. Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

h. Order such further relief as the Court may deem proper and just.

Dated: January 13, 2025

Respectfully submitted,

_s/ Jared B. Magnuson_

William T. Thompson*
24088531 (TX)
Matthew H. Frederick*
24040931 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com
matt@lkcfirm.com

Jared B. Magnuson*
131189 (GA)
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Jonathan F. Cohn*
2972578 (NY)
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
(512) 693-8350
jon@lkcfirm.com

Mark M. Rothrock*
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

*Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiffs*